HUGH J. McEVOY, Plaintiff, *v.* ATHENS HOTEL Co., INC., Defendant.

Supreme Court, New York County, November, 1923.

**Brokers — real estate — commissions — lease of hotel and sale of good will — introduction of parties — evidence insufficient to sustain finding that plaintiff brought about lease and sale of good will — verdict for plaintiff set aside as against weight of evidence.**

One H., the lessee, and the purchaser of the good will and furnishings of a hotel property owned by defendant corporation of which P. was the president, organized a company which took over the lease and property purchased. In an action by a licensed real estate broker to recover commissions for negotiating the lease, which was for a long term, and the sale of the good will and furnishings, the plaintiff's right to a recovery was predicated upon an allegation that he induced the lease and sale, but the agreement, which the proof tendered to establish, namely, that plaintiff was to be paid commissions upon the defendant's effecting

a lease and sale with a customer introduced by the plaintiff and with whom the defendant should have the right to carry on its own negotiations, was not pleaded. The evidence seemed to establish that plaintiff wholly failed in his efforts to bring H. and P. to any agreement and that the lease and sale were effected through the efforts of one M. who introduced H. to P. three months after plaintiff introduced them. The chief question submitted to the jury, aside from the amount of the commissions sued for, was whether the plaintiff induced the sale and the verdict was in favor of plaintiff. *Held*, that while the evidence was sufficient to sustain a finding that plaintiff introduced H. to P., he had failed to sustain the burden of proof to show that the defendant and H. were brought to any agreement through his efforts.

In the circumstances plaintiff's introduction to defendant's president P. of H. with whom defendant subsequently had successful negotiations either through its own efforts or through the efforts of another broker did not avail the plaintiff.

A motion to set aside the verdict in favor of plaintiff, as against the weight of evidence and for a new trial, granted.

Motion to set aside a verdict in favor of the plaintiff.

*Henry Morris Haviland*, for plaintiff.

*William H. Beam* (*James P. Callender* and *Nathaniel Elsberg*, of counsel), for defendant.

O'Malley, James, J. The plaintiff has secured a verdict of $27,000 for broker's commissions for negotiating a long term lease on property formerly known as the Athens Hotel on East Forty-second street, and for the sale of its good will and furnishings. The property was rented for $1,875,000 and the good will sold for $80,000.

The evidence was sufficient to sustain a finding that the plaintiff introduced the purchaser and lessee to the defendant's president, and the plaintiff claims to have been the efficient procuring cause of effecting the sale and lease. The defendant, on the other hand, claims never to have known the plaintiff in the transaction and that the evidence, as a whole, clearly shows that the sale and lease were effected, not through the plaintiff's but through the efforts of another broker who has been paid his commissions.

Decision on the defendant's motion to dismiss at the close of the plaintiff's case was reserved, as was also the decision on its motion to dismiss and for the direction of a verdict made at the close of the case. By acquiescence of counsel the chief question submitted to the jury, aside from the amount of the commissions, was whether the plaintiff induced the sale. This issue having been resolved in the plaintiff's favor, the defendant now moves to set aside the verdict and for a new trial, and also renews its motion for a direction. Both because of the amount involved and of the peculiar nature of the case, I deem it necessary to review the evidence at some length.

The real lessee and purchaser of the property was one Hollings-

worth.   Through his efforts a corporation known as the St. Cloud Hotel Company was organized, which company finally took over the lease and the property purchased.   The lease to the corporation was made about January 26, 1921.

One Polymero was the president of the defendant, the Athens Hotel.   The plaintiff, a licensed real estate broker who claims to have long been a customer of Polymero's hotel, testified that he knew for some time that Polymero's property was in the market; that on Labor Day, 1920, while he was eating in the restaurant he became engaged in conversation with Polymero in regard to the matter; that Polymero asked him if he knew any one who would purchase or lease his property; that he would prefer to lease it; that his price was $100,000 a year for a term of twenty-one years with the right of two or three renewals, and that he would sell the good will and furnishings for $100,000; that when plaintiff suggested that the price was too high Polymero said he might " shade it a good deal," and suggested a rental of $75,000 to $100,000 for the first term of twenty-one years.   Plaintiff told Polymero that he had several parties in mind and the latter asked him for the names of some of them so that he could know something of their business standing.   Plaintiff thereupon mentioned two men.   One was Hollingsworth who had recently sold out a hotel business for a price of $650,000.   When the name was mentioned Polymero told the plaintiff that he need go no further because Hollingsworth " could fill my bill."

Polymero being agreeable to an appointment, plaintiff immediately telephoned to Hollingsworth, and arranged for a meeting two days later at Polymero's place of business.   Polymero requested the plaintiff to treat the matter in confidence as he did not want his employees to know about it, because he feared they would leave his employ, and for the same reason he wished to handle the deal himself.   He said he would pay plaintiff his commissions when the lease was signed.

Polymero then asked plaintiff what his charges would be.   The plaintiff said he would charge the rates of the Real Estate Exchange, ten per cent on the sale price of the good will and furnishings, and one and one-half per cent on the total rentals up to $200,000 and one per cent on the balance.   Polymero agreed to pay on this basis, " if Mr. Hollingsworth fills the bill."

Plaintiff says that Polymero insisted that the understanding between them be substantiated in writing.   The plaintiff thereupon wrote a letter, made two duplicate copies of it and delivered one such copy to Polymero the following day, September seventh.   In this letter plaintiff wrote, among other things:

" By your request I hereby set forth to you in writing a short synopsis to confirm our agreements made in conference with you there yesterday in preparation for the leasing of your property as well as for the sale of furnishings and equipments which you own therein, viz, the Hotel Athens, Inc., and which you state you are the president.

" Let me say that in all my thirty years as a real estate broker, it is the first time that such a request has been made of me even to my turning over to you my clients names and addresses and telephone No. as well as their financial standing, so that after my introducing them to you you can work out your own deal. Since you say that it is the only way you will do business on account of the privacy you desire to keep to yourself and not let your associates or help know about your affairs. I have no hesitancy in so doing though you have already in your vest pocket from me the names and addresses as well as telephone No. of my clients selected by me who would make you very desirable tenants, viz., Mr. Louis Markel, owner of property, 17 and 19 West 32nd Street, Telephone No. 3400 Madison, owner of chain hotels, Mr. Charles A. Hollingsworth, who just sold his property, 145 to 149 West 47th Street to the Salvation Army for about $650,000. He is formerly a middle West St. Louis man and considered wealthy, residing now at No. 800 Riverside Drive, Telephone 5520 Audubon. Not finding him there you may get him at his son's office in the Woolworth Building, keeper of chain cigar stores.

" Mr. William H. Washer, whom you may remember kept the Bryant Park View Hotel on 42nd Street between 5th and 6th Avenue, and who recently sold his business at No. 2363 Broadway, and resides now at 200 West 86th Street, Telephone 7136 Schuyler.

" I will adhere strictly to your wishes and ask the rental stated by you viz, running from $75,000 per year up to $100,000 — *Net of course,* same for the furnishings and equipment. But since you are going to handle the deal yourself after meeting my people, I will not say much about this point leaving matters open for you to agree on price and terms with my clients, whichever one you may select, though these figures are high compared with the figures you state you had or about to sell and leased your premises to a restaurant concern on Park Place at $60,000 net rental per year and that the deal fell or might fall through on account of security. But I will tell my people that you will make a lease for 21 years with perhaps one–two or three 21 year renewals as stated and agreed on yesterday.   *   *   *

"About my clients making individual leases, I can safely say knowing them as I do for a long time, that neither of them would

make an individual hotel lease, but would form a hotel company to take over your property.

" We settled your own commission figures yesterday and which is correct according to the Real Estate Exchange, viz. that you will pay me 10% as per bill of sale for good will and equipments.

"And one and a half (1½%) per cent. up to $200,000 and one per cent (1%) thereafter as per lease signed on rental of premises.

" Just as soon as I get in touch with my people and set the time for meeting you and inspect the premises, I will phone (or better still) will call personally on you and tell you the time set which will be some day after 2 P. M. which you say your mid-day lunch rush is over.

"Assuring you that you can trust me implicitly by keeping matters strictly confidential,    " Respectfully yours.   *   *   * "

On the following day, September eighth, plaintiff brought Hollingsworth to Polymero. He claims to have spent an hour on the premises; that they went into the kitchen and upstairs and " showed him everything." Respecting this interview the plaintiff further testified " the conversation was just as I said first. He put it to him in the same form. What he wanted for the equipment, that he would like to get $100,000 for the equipment, good will and furnishings; " that Hollingsworth said that he had the money as he had sold his other hotel for $650,000, and that the talk ended by Hollingsworth saying: " I will talk with Mrs. Hollingsworth and we will be back again. I will be back again."

The plaintiff had no further talk or negotiations with Polymero about the matter until in January of the following year, or until a day or two before the lease to the St. Cloud Hotel Company was made. At that time he claims to have seen Polymero in company with Mr. Washer who was mentioned in his letter to Polymero, dated September seventh, and to have recommended Washer to Polymero as one who had capital to put into the corporation which was being organized by Hollingsworth to take over the lease. He claims that he was then told by Polymero that the deal was closed; that Mr. Boardman was going in with Hollingsworth and that the necessary capital had been raised. He testified that he took Washer to Polymero because he had heard that Hollingsworth was having difficulty in raising capital through Boardman. At that conversation, he claims that he told Polymero that he, Polymero, knew that when the lease was signed by Hollingsworth, Polymero would owe the plaintiff his commissions. That Polymero replied: " you took him here and showed the premises to him. I certainly will have to pay you the commissions if he signs the lease." The

plaintiff also testified that after September eighth he talked with Hollingsworth, who was telling him all the time how he was getting along and that he was handling the deal with Polymero and that the plaintiff should let him alone.

Hollingsworth, who was called by the plaintiff, corroborated him in respect to the appointment made by the plaintiff to have him meet Polymero and to having been introduced to Polymero by the plaintiff. He testified, however, that according to his recollection the meeting and introduction took place at the Hotel Belmont and not at Polymero's hotel. In any event he denied positively that he visited or inspected any portion of the Athens Hotel. He claims that Polymero asked $100,000 a year rent and $100,000 for the good will and furnishings and big security; that he asked for a statement of the business which Polymero refused to give on the ground that he was a hotel man and ought to know what the business was; that " I said all right I would see him again and I went on my way." On cross-examination he testified respecting this meeting that Polymero was very cold and did not warm up.

He testified further on direct that he did not see Polymero after that day, September eighth, until early in January, 1921; that he saw the plaintiff at different times, talked it over with him, told him the price was too high and that he was not going any further with it. On cross-examination he said that he told the plaintiff right after the meeting with Polymero and himself that the price was too high and that he " would not touch it." With respect to the manner in which Hollingsworth, several weeks later, closed the deal through another broker named Mathes, he testified on direct examination: " Well, the way we finally purchased the property was, I met Mr. Mathes on the street one day, who was a mutual friend of Mr. Boardman's and myself. Mr. Mathes said he had the Hotel Athens property and he could do more with Mr. Polymero than anybody else, so he introduced me to Mr. Boardman. We then called on Mr. Polymero, and Mr. Polymero dropped his price from $100,000 to $80,000, and from $100,000 purchase price to $80,000, and he went from $100,000 down to $80,000 and $85,000, and gave us a forty-two year lease, and we closed on that basis."

He testified further that when he was taken to Polymero by Mathes the latter introduced him and that he did not mention to Polymero having met him in September through the plaintiff and that Polymero had forgotten it; that he at no time mentioned the plaintiff's name to any of the parties after opening negotiations through Mathes, and that the first time he saw or was shown through the defendant's property was after Mathes came into the deal.

One Leonard, who had agreed with the plaintiff to share in any

commissions earned by them on the sale and lease of hotel property to Hollingsworth, testified that he had talked with the latter in relation to his negotiations with Polymero; that late in December, Hollingsworth told him that the negotiations were practically completed for the lease and that he was quite sure that it would go through; that he was conducting the negotiations direct with Polymero, and that he would prefer to do it that way as he got along very well with him; that he thought it just as well for the brokers not to come near Polymero or have anything to do with him until the deal was closed; that on or about from January twenty-second to twenty-fourth he and the plaintiff talked to Hollingsworth about the deal not having been closed and that the latter said the reason for the delay was that the people who were going to take over the restaurant part of the hotel had got cold feet; that the witness and the plaintiff suggested to him substituting Mr. Washer as a partner with Hollingsworth who suggested that they make the appointment to have Polymero meet Washer because he wanted Polymero's approval of the man who would go in the deal with him; that he and the plaintiff saw Polymero and made an appointment to bring Washer around. It will be recalled that the plaintiff testified to having brought Washer to Polymero who said that it was then too late for Washer to come in as the deal had been closed, Mr. Boardman having finally decided to come in.

On behalf of the defendant Polymero testified that he had had negotiations with numerous brokers with respect to selling his property; that he had no recollection of meeting Hollingsworth through the plaintiff; that he had no recollection of having talked with the plaintiff at any time until after the deal was closed, and on the occasion when the plaintiff asked him for commissions. He denied having promised to pay plaintiff commissions at that time; denied that he had ever received the plaintiff's letter of September seventh purporting to set forth an agreement between him and the plaintiff; denied having seen or heard of Leonard or of having talked to him or the plaintiff or to Washer or having heard of the latter until the trial. He testified that the only broker he knew was Mathes to whom he had paid $9,000 in commissions.

Mathes testified to having taken Hollingsworth and Boardman to Polymero and to the extensive efforts he had made in inducing the sale and that he had never heard of the plaintiff in the transaction. He was corroborated in many respects by Hollingsworth, Boardman and Polymero in respect to his efforts in the matter.

It is to be noted that the complaint upon which the plaintiff

predicates his cause of action alleges that he induced the lease and sale. It does not allege the agreement which his proof tends to establish, namely, that the plaintiff was to be paid commissions upon the defendant's effecting a lease and sale with a customer introduced by the plaintiff and with whom the defendant should have the right to carry on its own negotiations. Unless, therefore, the plaintiff was the procuring cause of the lease and sale, he would not be entitled to recover.

To sustain his cause of action it was necessary for the plaintiff to show by a preponderance of the evidence that the defendant and Hollingsworth were brought to an agreement through his efforts. *Sibbald* v. *Bethlehem Iron Co.,* 83 N. Y. 378. If he failed in the accomplishment of this result his introduction to the defendant of Hollingsworth with whom the defendant subsequently had successful negotiations, either through its own efforts or through the efforts of another broker, would not avail the plaintiff. *Sibbald* v. *Bethlehem Iron Co., supra; Miller* v. *Vining,* 112 App. Div. 304; *Sampson* v. *Graves,* 199 id. 762, 765.

I am of opinion that the plaintiff failed to sustain the burden of proof to show that the defendant and Hollingsworth were brought to an agreement through his efforts. The evidence seems to establish that he wholly failed in his efforts and that the lease and sale were effected through the efforts of Mathes after a lapse of some three months after the plaintiff introduced Hollingsworth to the defendant's president. Upon his own testimony the agreement between Polymero and Hollingsworth did not result at their meeting on September eighth. The testimony of Hollingsworth, whom the plaintiff called to establish his case, thus vouching for his credibility, tends to show that he refused to consider the terms originally submitted by Polymero, and that it was only after Mathes had been brought in and negotiations with Polymero opened anew that an agreement was effected. I cannot see that the plaintiff's case is aided materially by Leonard's testimony. He appears not to have participated in any of the negotiations until more than three months after September eighth, and then only with Hollingsworth. When he met Polymero the deal was all but closed.

Under all the circumstances I am of opinion that the verdict of the jury is against the weight of the evidence. It is, therefore, set aside and a new trial granted.

Ordered accordingly.